Michele Anderson-West (9249)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573
michele@stavroslaw.com
  *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH-CENTRAL DISTRICT**

| | |
|---|---|
| TRACE Z. HANSON,<br><br>  Plaintiff,<br>v.<br><br>KENNECOTT UTAH COPPER LLC, a domestic corporation,<br><br>  Defendant. | **COMPLAINT**<br>**And JURY DEMAND**<br><br>**Case No. 2:21-cv-00642**<br><br>**Judge David Barlow** |

Plaintiff Trace Hanson, by and through his counsel, brings this Complaint against Defendant pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., as amended ("ADA") and for causes of action, alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Trace Hanson ("Mr. Hanson") is an individual who at all times relevant to this complaint resided in Salt Lake County, Utah.

2. Defendant Kennecott Utah Copper LLC ("Defendant") is a domestic limited liability corporation that, among other things, does business in Salt Lake County, Utah.

3. This Court has jurisdiction over Mr. Hanson's federal claims pursuant to 28 U.S.C. §1343(4). This Court also has jurisdiction pursuant to the ADA, 42 U.S.C. §12117.

1

4. The employment practices alleged to be unlawful were committed in Salt Lake County, Utah, which is within the jurisdiction of the U.S. District Court for the District of Utah, Central Division. Accordingly, venue is proper pursuant to 28 U.S.C. §1391.

5. Mr. Hanson has exhausted and satisfied all administrative remedies and prerequisites associated with his claims of disability discrimination and retaliation under the ADA.

6. Mr. Hanson timely filed a charge of discrimination with the Utah Labor Commission, Antidiscrimination and Labor Division and the Equal Employment Opportunity Commission ("EEOC") on or about December 15, 2020. Mr. Hanson requested and obtained a Notice of Right to Sue from the EEOC dated August 2, 2021.

7. This action is commenced within 90 days of Mr. Hanson's receipt of the EEOC Notice of Right to Sue.

8. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted, at all times relevant herein, in the course and scope of their employment with and for Defendant.

## FACTUAL ALLEGATIONS

9. In or around December 2017, Defendant hired Mr. Hanson to work as a power plant operator.

10. Mr. Hanson has suffered from depression and anxiety throughout his life, which was generally managed through medication. During the on-boarding process, Mr. Hanson reported he takes medications for depression, anxiety and attention deficit disorder.

11. After a few months, Mr. Hanson transferred to work at the Refinery as a Mechanical Craftsman C.

12. Mr. Hanson's job duties as a Mechanical Craftsman C included, but were not limited to performing various maintenance tasks, including installing, maintaining, and repairing equipment.

13. During his time employed with Defendant, Mr. Hanson was promoted to Mechanical Craftsman B.

14. In February 2019, Mr. Hanson had tapered off his medications to see how he would feel if he did not take medications for depression, anxiety and attention deficit disorder.

15. The side effects were not good. Mr. Hanson's daily activities were impacted by his depression, anxiety and attention deficit disorder. For example, Mr. Hanson had trouble concentrating, lost his appetite, had mood-swings, had trouble sleeping, he felt sad, hopeless, anxious, and missed several days of work -to name a few.

16. Mr. Hanson saw a physician in March 2019 to get back on medication to control his depression, which had significantly worsened after he stopped taking medication.

17. Mr. Hanson spoke with his supervisor, Mr. Dumas privately about his depression and restarting his medications. Mr. Hanson told Mr. Dumas he was having a very difficult time and asked for accommodation of patience, understanding and leniency while he worked to get his medication right.

18. Between August 2019 and October 2019, Mr. Hanson had a particularly rough time with his mental health that was aggravated when his young son was hospitalized for two weeks in August 2019. Mr. Hanson called into work several times and applied for intermittent leave through the FMLA.

19. During that same time period, Mr. Hanson's grandfather died and his wife's grandmother died. Mr. Hanson took days off for bereavement and the funerals.

20. Mr. Hanson had approximately two "call offs" in October 2019 associated with his depression for which he texted Mr. Dumas telling him that he simply could not come to work telling him that he was just not in a good place mentally.

21. Also, in October 2019, Mr. Hanson was diagnosed with bipolar disorder and his doctor changed medications. Mr. Hanson again talked with Mr. Dumas, explained his situation and again asked for paperwork to fill out for leave under the

FMLA again asked him for reasonable accommodation of his patience, understanding and leniency as to his mood swings and absences.

22. Mr. Dumas asked Mr. Hanson to let him know if there was anything that Mr. Dumas could do to help him. In response, Mr. Hanson reiterated that he wanted reasonable accommodation as mentioned above because it would take time to get his medications figured out.

23. During that same timeframe, Mr. Hanson completed the requirements Craftsman B and put in the paperwork for a promotion from Craftsman C to Craftsman B-which was approved by Mr. Dumas. This promotion included a raise from $26.70 per hour to $28.18 per hour.

24. Mr. Hanson continued seeking out therapy and continued seeing his physician and increasing medication doses trying to achieve minimal depression and mental and emotional stability.

25. When Mr. Hanson arrived at work on November 7, 2019, Mr. Dumas called him to his office, said he was sorry that he had to do 'this' and told Mr. Hanson that he has to "fix his attendance." Mr. Dumas gave Mr. Hanson a verbal warning.

26. Mr. Hanson confided in Mr. Dumas and told him he was diagnosed with bipolar disorder in addition to depression. Mr. Hanson told him he was given new medication and was having a really hard time and explained to Mr. Dumas some of the ways his depression and bipolar manifests in the workplace. For example, impatience,

irritation, loss of self-worth, loss of sleep, hopelessness, feeling defeated, fatigue, body aches, suicidal ideation, weight gain, mood swings and problems with interpersonal communication, to list a few.

27.     Mr. Dumas again told Mr. Hanson he was sorry and to let him know if there was anything at all he could do.  Hanson asked Dumas for FMLA paperwork due to the frequency of his absences and effects of his disability and again told Mr. Dumas that reasonable accommodation for his disability would be having leniency as to his absences, behavior and mood swings.

28.     Mr. Dumas told Mr. Hanson that some of the guys were mad at him because he missed so much work.  Mr. Dumas recommended that Mr. Hanson tell his coworkers about his bipolar and depression.

29.     Later that day, Mr. Hanson told his six team members about his disability and gave examples of how his depression and bipolar manifests. Some of his co-workers responded by telling Mr. Hanson of people they knew who also were bipolar, one person said that his father-in-law was diagnosed with bipolar but refused to deal with it.

30.     Mr. Hanson continued with his medication and had good days and bad days.

31.     On February 14, 2020 Mr. Hanson was called for a disciplinary meeting where Mr. Dumas and Mr. Romrell (Mr. Dumas' supervisor), discussed reprimanding Mr. Hanson because he called out absent four times since November 2019.  Mr. Hanson

told Mr. Romrell about his depression and bipolar and that he was working on getting his medication right. Once again, Mr. Hanson pleaded with Defendant for patience and understanding as an accommodation for his disability.

32. Mr. Hanson told Mr. Romrell and Mr. Dumas that Defendant is supposed to have a very strong stance on supporting its employees as to mental health and disabilities.

33. Mr. Romrell responded telling Mr. Hanson "from what [he] can tell, a lot of people are 'fakers' and just want to take time off work."

34. Thereafter, Mr. Dumas and Mr. Romrell started treating Mr. Hanson less favorably than they treated other employees, who, upon information and belief, were not bipolar and did not have depression.

35. For example, both Mr. Dumas and Mr. Romrell started to micro-manage him; spoke to him in a rude dismissive manner; and reprimanded him for things that did not require reprimand.

36. Mr. Hanson followed up on his FMLA paperwork and learned that it had not been processed because Defendant's insurer, MetLife, had not issued a claim number or something to that extent and Mr. Hanson was required to resubmit paperwork to his doctor who then resubmitted the paperwork to Defendant.

37. In or around March 2020, Mr. Hanson's FMLA was approved and was to be effective retroactively beginning in November 2019.  Mr. Hanson was relieved that his absences in November (for which he was written up) as well as those he had in

December, January and February were all approved as FMLA absences that were not to be counted against him.

38. In June 2020, Mr. Dumas and Mr. Romrell met with Mr. Hanson and gave him a final written warning which were based on absences that should have been covered by his intermittent FMLA.

39. Mr. Hanson scheduled grievance meetings through the Union-but the meetings kept being cancelled by Mr. Romrell.

40. On or around August 14, 2020, Mr. Hanson was issued two more written warnings. One was for a job that was performed on August 4, 2020. The second was for insubordination after an incident occurring on August 7, 2020. During that incident, Mr. Hanson questioned Mr. Dumas' ability to be a good manager and confronted Mr. Dumas for looking more closely at Mr. Hanson than other employees to catch him doing something wrong.

41. Defendant held a termination meeting with Mr. Hanson on October 2, 2020. Present was Mr. Hanson's union representative, Mr. Dumas, Mr. Romrell, and a Defendant's HR representative. Mr. Hanson was forced to listen to false statements made about him and he became very upset.

42. The union representative asked Defendant why it had not taken Mr. Hanson's disability, requests for accommodation and FMLA into consideration when

deciding to terminate Mr. Hanson's employment.  The HR representative said that "behavioral symptoms of mental illness are not covered"- or something to that extent.

43.     Next, the HR representative asked Mr. Hanson if he had considered taking a leave of absence.  Mr. Hanson told HR that he did not require a leave of absence because he had requested accommodation and had intermittent leave approved under the FMLA.  Defendant responded by saying something to the extent that it was too late for Mr. Hanson at that point.

44.     On October 6, 2020, Defendant sent Mr. Hanson a letter terminating his employment effective October 6, 2020.

45.     Mr. Hanson, upon receiving the letter, drove to several pawn shops looking for a gun intending on killing himself.  The pawn shops did not have handguns and Mr. Hanson found a gun shop that was just closing.

46.     Luckily, the gun shop owner would not sell Mr. Hanson a gun that evening- and without knowing it, prevented Mr. Hanson from taking his life that night.

47.     Mr. Hanson filed a Charge of Discrimination with the Utah Labor Commission Antidiscrimination and Labor Division on or around December 15, 2020 and received a Notice of Right to Sue from the EEOC dated August 2, 2021.

## FIRST CAUSE OF ACTION
### Disability Discrimination

48.     The preceding paragraphs are incorporated herein by reference.

49. At all times relevant hereto, Defendant was an "employer" and a "covered entity" within the meaning of the ADA.

50. Mr. Hanson, at all times relevant herein, was Defendant's "employee" as that term is defined under the ADA.

51. At all times relevant hereto, Mr. Hanson was qualified to perform the essential functions of his job and did perform the essential functions of his job with or without reasonable accommodation.

52. The ADA prohibits discrimination against an individual because of disability, a record of a disability or being regarded as disabled.

53. Mr. Hanson is disabled within the meaning of the ADA in that he has a record of a disability (depression, bipolar disorder and anxiety) that limits one or more of his life activities. Some of Mr. Hanson's life functions impacted by his disability include inability to focus, sleeplessness, body aches, fatigue, fatigue, body aches, suicidal ideation, weight gain, mood swings and problems with interpersonal communication, inability to concentrate, and engage in interpersonal communications and relationships, to list a few.

54. Defendant acknowledged Mr. Hanson's disability and knew Mr. Hanson was disabled within the meaning of the ADA.

55. In or around October 2019, Mr. Hanson requested accommodation from Defendant, which included asking his supervisors to have patience with him while he got his medication under control and have some lenience when Mr. Hanson was absent from work due to his debilitating depression and bipolar disorder. Mr. Hanson also requested that he was accommodated by applying for intermittent FMLA to cover required absences.

56. Shortly thereafter, Defendant discriminated against Mr. Hanson in the terms and conditions of his employment and terminated Mr. Hanson's employment because of his disability.

57. Defendant's violation of the ADA has directly and proximately caused Mr. Hanson to suffer substantial past and future economic loss, lost wages and benefits, damage to his career and professional reputation, emotional distress, pain and suffering and caused Mr. Hanson to have suicidal ideation.

58. Defendant is required to make Mr. Hanson whole in the form of back pay, lost benefits and other renumeration associated with his employment and loss of employment in an amount to be determined at trial, including recovery of his pecuniary and non-pecuniary damages.

59. Mr. Hanson is also entitled to reinstatement, or in lieu of reinstatement, front pay in an amount to be proven at trial.

60. Further, because Defendant's conduct was willful and malicious and manifested a knowing and reckless indifference toward and disregard of Mr. Hanson's federally protected rights, Mr. Hanson is entitled to an award of punitive damages in an amount to be determined by the jury.

61. Mr. Hanson is also entitled to reimbursement of costs and attorneys' fees in associated with bringing this action.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of the ADA

62. The preceding paragraphs are incorporated herein by reference.

63. The ADA prohibits employers from retaliating against an employee who has opposed any act or practice made unlawful by the ADA.

64. Mr. Hanson engaged in a protected activity when he asked Defendant for reasonable accommodation for his disability.

65. The actions of Defendant in harassing, micromanaging and terminating Mr. Hanson after he requested accommodation for his own disability constitutes retaliation prohibited by the ADA.

66. Defendant's actions have directly and proximately caused Mr. Hanson substantial past and future economic loss, including lost wages and benefits, damage to his career and professional reputation, humiliation, emotional distress, pain and suffering and suicidal ideation in and amount to be proven at trial.

67. Mr. Hanson is also entitled to reinstatement, or in lieu of reinstatement, front pay in an amount to be proven at trial.

68. Because Defendant's conduct was willful and malicious and manifested a knowing and reckless indifference toward and disregard of Mr. Hanson's federally protected rights, he is entitled to an award of punitive damages in an amount to be determined by the jury.

## REQUEST FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Mr. Hanson requests a trial before a jury.

## **CONCLUSION & REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a. For a ruling and judgment in Plaintiff's favor and against Defendant for all causes of action asserted herein;

b. For all wages, compensation and other economic benefits lost as a result of the actions and omissions of Defendant;

c. For all special and general damages available to him, including pecuniary and non-pecuniary losses;

d. For an award of attorney's fees and costs, as allowed by the foregoing claims;

e. For an award of punitive damages;

f. For prejudgment and post-judgment interest as allowed by law; and

g. For such additional and other relief, the court deems just and equitable.

Respectfully submitted this 29th day of October 2021.

                                                  /s/ Michele Anderson-West
                                                  Michele Anderson-West
                                                  STAVROS LAW P.C.
                                                  *Attorneys for Plaintiff*