## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| TRACE Z. HANSON,<br><br>Plaintiff,<br><br>vs.<br><br>KENNECOTT UTAH COPPER LLC,<br><br>Defendant. | **ORDER GRANTING [15] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00642<br><br>Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is Defendant Kennecott Utah Copper LLC's ("Kennecott") Motion for Summary Judgment.[1] Kennecott seeks summary judgment on Plaintiff Trace Hanson's claims for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"). For the reasons that follow, the court grants Kennecott's motion.

### BACKGROUND[2]

Kennecott hired Mr. Hanson as an "operator C" at its power plant on November 10, 2017.[3] After a few months, Mr. Hanson transferred to work at Kennecott's refinery as a "mechanical craftsman C."[4] His job duties included "performing various maintenance tasks,

---

[1] Mot. Summ. J., ECF No. 15, filed May 12, 2023.

[2] For purposes of summary judgment, the court "construe[s] all facts and make[s] reasonable inferences in the light most favorable to the nonmoving party." *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108 (10th Cir. 2002) (citing *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211 (10th Cir. 2001)).

[3] Hanson Dep. 70:19–71:5, ECF No. 16-1.

[4] *Id.* at 73:23–74:5.

1

including installing, maintaining, and repairing equipment."[5] His supervisor at the refinery was Tyler Dumas.[6] Mr. Dumas reported to Chris Romrell, the superintendent.[7]

In March 2019, Mr. Hanson informed Mr. Dumas that he suffered from depression and anxiety.[8] Mr. Dumas asked Mr. Hanson how he could help, and Mr. Hanson asked for "patience, understanding, and leniency" while Mr. Hanson worked to adjust his medication.[9]

In August 2019, Mr. Hanson applied for and received leave under the Family and Medical Leave Act ("FMLA") for his son's health condition.[10] The next month, Kennecott granted Mr. Hanson bereavement leave due to the death of a grandparent.[11] Mr. Hanson also took unpaid leave September 28–29.[12]

On October 6, 2019, Mr. Hanson informed Mr. Dumas that he was going to be absent from work that day.[13] On October 25, he again called off work, but this time he called Mr. Dumas two and a half hours after the start of his shift.[14] Sometime that month—October 2019—Mr. Hanson was diagnosed with bipolar disorder.[15] He informed Mr. Dumas about the diagnosis and explained how it impacted his attendance and his behavior.[16] Again, he asked Mr. Dumas for

---

[5] *Id.* at 74:6–74:13.
[6] *Id.* at 75:21–75:25.
[7] *Id.* at 76:1–76:6.
[8] *Id.* at 95:16–95:19.
[9] *Id.* at 95:20–96:1.
[10] *Id.* at 102:5–102:8.
[11] *Id.* at 105:24–106:5.
[12] *Id.* at 106:6–106:12.
[13] *Id.* at 106:13–106:16.
[14] *Id.* at 106:21–107:3.
[15] *Id.* at 96:4–96:7.
[16] *Id.* at 96:8–96:16, 98:23–99:6.

"patience, understanding, and leniency,"[17] and again, Mr. Dumas asked what he could do to help.[18] Mr. Hanson reiterated his request.[19]

On November 7, 2019, Mr. Dumas gave Mr. Hanson a verbal warning for excessive absenteeism due to him calling off work six times between August 21 and November 2, 2019.[20] He informed Mr. Hanson that if Mr. Hanson needed FMLA, he "would do what he could to help" Mr. Hanson.[21] That same month, Mr. Hanson attempted to seek FMLA for his bipolar disorder, depression, and anxiety, but he neglected to obtain a claim number before submitting it, and the paperwork was not processed by MetLife, Kennecott's FMLA administrator.[22] The next month, December 2019, Mr. Dumas and Mr. Romrell approved Mr. Hanson's promotion to "mechanical craftsman B."[23]

Between November 2019 and February 2020, Mr. Hanson had four more "chargeable occurrences" of absenteeism.[24] On February 14, 2020, Mr. Dumas gave Mr. Hanson a written warning for his attendance.[25] In March, Mr. Hanson correctly submitted an FMLA application.[26] That same month, MetLife approved Mr. Hanson for intermittent FMLA leave in the form of one occurrence every twelve weeks, two days per episode.[27] MetLife backdated Mr. Hanson's FMLA approval to November 1, 2019.[28] It also retroactively approved Mr. Hanson's five

---

[17] *Id.* at 96:17–96:20.
[18] *Id.* at 96:21–96:23.
[19] *Id.* at 96:24–97:1.
[20] *Id.* at 107:20–108:2; Verbal Warning Discipline Nov. 7, 2019, ECF No. 16-9 at 3.
[21] Hanson Dep. 108:3–108:20.
[22] *Id.* at 109:14–120:7.
[23] *Id.* at 76:24–77:5.
[24] *Id.* at 109:6–109:9.
[25] *Id.* at 109:2–109:5.
[26] *Id.* at 110:10–111:3.
[27] *Id.* at 111:4–111:24.
[28] *Id.* at 110:10–112:8.

absences between November 2, 2019 and February 12, 2020 as FMLA-qualifying leave.[29] In response, Kennecott eventually withdrew its February 14, 2020 written warning to Mr. Hanson.[30]

Mr. Hanson took FMLA leave April 15–16.[31] On April 26, Kennecott recorded that Mr. Hanson was late to work.[32] He was then absent from work May 17–18.[33] Those dates were not approved as FMLA leave because they exceeded the scope of Mr. Hanson's authorization from his doctor.[34] On June 28, 2020, Kennecott gave Mr. Hanson a written warning for excessive absenteeism because of these three "chargeable offenses" since the February warning.[35] Because Kennecott had not yet withdrawn Mr. Hanson's February warning, he was put on attendance probation.[36] Eventually, the attendance probation was reduced to a written warning after Kennecott updated its paperwork.[37]

On May 26, 2020, Mr. Dumas learned from Mr. Hanson's coworker that Mr. Hanson had been gone from his assignment for an hour.[38] Mr. Hanson remembers that he told his coworker that he was going to the restroom, that it "takes [him] a while," and that he had irritable bowel syndrome-constipation ("IBS").[39] Mr. Hanson also states that he had told Mr. Dumas that he had IBS at some point.[40] Mr. Dumas radioed Mr. Hanson, but Mr. Hanson did not respond.[41] Mr. Dumas remembers that he called Mr. Hanson's cell phone, but Mr. Hanson did not pick up his

---

[29] *Id.* at 110:15–112:8.
[30] *Id.* at 112:9–112:16.
[31] *Id.* at 113:13–113:16.
[32] *Id.* at 118:21–118:24.
[33] *Id.* at 113:17–113:23.
[34] *Id.* at 113:17–113:23.
[35] *Id.* at 118:14–118:24.
[36] *Id.* at 118:17–118:20.
[37] *Id.* at 124:3–124:5.
[38] *Id.* at 124:15–124:19.
[39] *Id.* at 131:1–131:23.
[40] *Id.* at 132:24–132:25.
[41] Dumas Dep. 78:2–78:8, ECF No. 16-8.

calls.[42] Mr. Hanson states that he did answer, but the called dropped so Mr. Hanson texted Mr. Dumas.[43] There is evidence that Mr. Hanson did text Mr. Dumas that evening, saying, "Using the restroom, what's up?"[44]

After an hour and a half, Mr. Dumas located Mr. Hanson exiting a building at the opposite end of the refinery from where his assignment was located.[45] Mr. Hanson told Mr. Dumas he had been using the bathroom.[46] In order to get to that building, Mr. Hanson passed six other bathrooms that he considered "unsavory" or "filthy."[47] According to Mr. Dumas, he noticed that Mr. Hanson had his radio on him, and they performed a radio check, confirming that Mr. Hanson's radio was working.[48] In contrast, Mr. Hanson remembers that he did not have his radio on him.[49]

In June 2020,[50] Mr. Dumas recalls an incident in which he checked in on Mr. Hanson's project and he asked how things were going.[51] Mr. Hanson made an "off-the-wall comment" that "caught [Mr. Dumas] off guard."[52] Mr. Dumas asked Mr. Hanson about the comment, and Mr. Hanson "approached [him] and pretty much tore into [him] at that point. [Mr. Hanson] told [Mr. Dumas] that [he] was the world's worst supervisor and he thought [Mr. Dumas] was the scum of

---

[42] Id. at 78:2–78:8.
[43] Hanson Dep. 128:10–128:19; Hanson Text Message to Dumas May 26, ECF No. 16-17.
[44] Hanson Text Message to Dumas May 26.
[45] Dumas Dep. 78:10–78:13.
[46] Id. at 79:8–79:9.
[47] Hanson Dep. 130:1–130:7.
[48] Dumas Dep. 81:9–81:16.
[49] Hanson Dep. 126:15–126:16, 127:18–128:7.
[50] Id. at 133:10–133:13.
[51] Dumas Dep. 36:16–36:19.
[52] Id. at 36:19–36:21.

the earth."[53] Mr. Hanson remembers that he told Mr. Dumas that he was frustrated, but he stated that he did not insult Mr. Dumas.[54] Mr. Dumas did not write him up for this incident.[55]

In July 2020, Mr. Dumas remembers that "Mr. Hanson was so disrespectful during a discussion with [Mr.] Romrell, the Superintendent, that one of Mr. Hanson's co-workers had to apologize for Mr. Hanson's rude behavior and explain that the crew did not want to be associated with his conduct."[56] Mr. Hanson does not recall the incident.[57]

On August 5, 2020, Mr. Hanson was assigned to work with a welder to reinstall a SX10 tank.[58] The project was a "high-priority job"[59] because the tank was "critical to plant operations and the production of gold"—while it was out of service, the entire process was stopped.[60] Although Mr. Hanson and the welder headed out to the project at 7:30 a.m., they had not entered the room with the SX10 tank as of 9:30 that morning.[61] According to Mr. Dumas, the welder later told him that Mr. Hanson said, "Whoa, I don't know if you know how maintenance works down here, but we're going to go into the shop and relax for a while" before Mr. Hanson took him to the maintenance shop, sat down, and used his phone for an hour.[62] At one point, another employee came in and asked what they were doing.[63] Mr. Hanson told the employee he was conducting a safety rundown with the welder.[64] At around 8:30, Mr. Hanson took the welder to

---

[53] *Id.* at 36:21–36:25.
[54] Hanson Dep. 133:25–134:14.
[55] Dumas Dep. 37:15–37:18.
[56] Dumas Decl. ¶ 9, ECF No. 16-13.
[57] Hanson Dep. 137:20–138:9.
[58] Dumas Statement 2, ECF No. 16-18.
[59] Dumas Dep. 62:7–62:8.
[60] Dumas Statement 2.
[61] *Id.*
[62] *Id.* at 3.
[63] Jensen Statement 2, ECF No. 16-19.
[64] *Id.*

the building with the SX10 tank.[65] However, they could not access the building because they did not have an escort for the welder.[66] Mr. Hanson called Mr. Dumas and told him that operations "didn't want to" escort the welder, so Mr. Dumas started paperwork for Mr. Hanson to be an escort.[67] Mr. Dumas completed the wrong form, but it was not until 9:30—an hour later—that Mr. Hanson informed him he had sent the wrong form.[68] Mr. Dumas asked why Mr. Hanson had not told him earlier, and Mr. Hanson replied that "he was telling [Mr. Dumas] now."[69] Mr. Dumas later followed up with operations to see if they had refused to escort the welder, but operations told him they did not receive any calls on the phone or the radio from Mr. Hanson that day.[70]

After conducting an investigation, Mr. Dumas concluded that the "reports and observations of [Mr. Hanson] loafing in the shop and keeping another team member from his work [were] true."[71] He recorded that they "also found [Mr. Hanson] lying about speaking with operations for escort support" and "lying about conducting a safety discussion."[72] He noted that Mr. Hanson "was extremely combative, disrespectful and insubordinate when conducting his interview."[73] Because of this, Mr. Dumas gave him a written warning and a three-day suspension.[74]

---

[65] Dumas Statement 3, ECF No. 16-18.
[66] *Id.* at 2.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.* at 4.
[71] Email from Dumas to Romrell, ECF No. 16-21.
[72] *Id.*
[73] *Id.*
[74] Dumas Decl. ¶ 14.

Following that investigation, Kennecott decided to make changes to the maintenance shop, including removing a seating area.[75] After those changes were implemented, Mr. Hanson used a broken-down cardboard box as a poster and wrote, "We thought this was the perfect way to say F**K YOU to our employees."[76] He signed off on the poster with a heart and Mr. Romrell and Mr. Dumas's names.[77] He also removed Mr. Dumas's chair from his office and replaced it with a metal chair.[78] Mr. Dumas believed Mr. Hanson was responsible for the sign, but at the time, Mr. Hanson denied involvement.[79] Kennecott performed an investigation of the sign, checking access records for the area and securing handwriting samples for all the individuals who entered the shop within the twenty-four hours preceding the discovery of the sign.[80]

Then, on September 24, 2020—before Kennecott concluded its investigation into the sign—Mr. Dumas assigned Mr. Hanson to work with a contract worker on a piping project.[81] Mr. Hanson refused to work with the contract worker.[82] Mr. Hanson states that the reason for his refusal was that he did not "feel safe" because the contract worker was not part of his crew, he had never worked with them before, and he did not know if the contract worker had ever worked at the refinery.[83] Mr. Dumas recalls that Mr. Hanson said he did not trust the contract worker (not that he did not feel unsafe with him), that he asked to work with one of his crew members, and then, when Mr. Dumas asked him if he was refusing to perform the task, that Mr. Hanson

---

[75] *Id.* at ¶ 15.
[76] Cardboard Sign, ECF No. 16-24 (redaction added); Dumas Decl. ¶ 17; Hanson Dep. 170:20–171:21.
[77] Cardboard Sign; Dumas Decl. ¶ 17.
[78] Hanson Dep. 174:13–174:16.
[79] Dumas Decl. ¶ 18; Hanson Dep. 176:5–176:10. Mr. Hanson has since admitted that he wrote the sign and removed Mr. Dumas's chair. *Id.* at 170:20–171:19.
[80] Hogendoorn Email, ECF No. 16-25.
[81] Dumas Decl. ¶ 21.
[82] *Id.* at ¶ 23.
[83] Hanson Dep. 183:11–184:13.

responded, "I wouldn't consider it refusing to perform the task. I would consider it me excusing myself to go home."[84] On his way out, Mr. Hanson told him, "You can consider this FMLA."[85] He did not tell Mr. Dumas why he needed FMLA leave, and it was his first mention of FMLA that morning.[86]

After this incident, Mr. Dumas "was involved in the review of Mr. Hanson's work history and misbehavior, including his loafing, name calling, prior suspension, dishonesty, and storming off the job."[87] Kennecott held an investigatory hearing on October 2.[88] Ultimately, Kennecott decided to terminate Mr. Hanson's employment as of October 6, 2020[89] for insubordination, leaving the workstation during work hours, and his August 14, 2020 suspension.[90]

On December 15, 2020, Mr. Hanson filed a Charge of Discrimination with the Utah Anti-Discrimination and Labor Division and the Equal Employment Opportunity Commission ("EEOC"), asserting claims against Kennecott for disability discrimination and retaliation.[91] The charge was dismissed, and the EEOC sent Mr. Hanson a notice of right to sue on August 2, 2021.[92] On October 29, 2021, Mr. Hanson filed the complaint in this action, alleging disability discrimination and retaliation in violation of the ADA.[93] On May 12, 2023, Kennecott filed the instant motion for summary judgment.[94] The motion was fully briefed as of July 11, 2023.[95]

---

[84] Dumas Dep. 25:7–26:6.
[85] *Id.* at 26:1; Hanson Dep. 186:8–186:11.
[86] Hanson Dep. 186:14–186:25.
[87] Dumas Decl. ¶ 25.
[88] Hanson Dep. 188:9–188:18.
[89] Dumas Decl. ¶ 25.
[90] Hanson Dep. 189:19–189:25; Termination Letter, ECF No. 16-29.
[91] Charge of Discrimination, ECF No. 16-30.
[92] Hanson Dep. 198:21–199:7.
[93] Compl., ECF No. 2.
[94] Mot. Summ. J.
[95] Reply, ECF No. 29.

**STANDARD**

Under Federal Rule of Civil Procedure 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[96] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[97] "The moving party is 'entitled to a judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."[98]

**DISCUSSION**

I.   **Kennecott Is Entitled to Summary Judgment on Mr. Hanson's Disability Discrimination Claims.**

   A.   *Kennecott Is Entitled to Summary Judgment on Mr. Hanson's Disability Discrimination Claim for Disparate Treatment Because Mr. Hanson Failed to Establish a Prima Facie Case.*

Under the *McDonnell Douglas* three-part analysis, "a plaintiff must first establish a prima facie case of ADA discrimination by proving '(1) he is disabled . . . (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability.'"[99] "To 'demonstrate "discrimination," a plaintiff generally must show that he has suffered an adverse employment action because of the

---

[96] Fed. R. Civ. P. 56(a).
[97] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).
[98] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).
[99] *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017) (quoting *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013)).

disability.'"[100] "After the plaintiff has made the requisite showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions."[101] "If the defendant proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely 'pretextual.'"[102] A "plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[103]

Kennecott does not dispute that Mr. Hanson is disabled or qualified. Kennecott asserts that Mr. Hanson's "disability discrimination claim fails because he cannot establish that Kennecott terminated his employment because of his asserted mental health issues."[104] In other words, Kennecott argues that Mr. Hanson cannot satisfy his prima facie burden.

"To show that []he was fired because of h[is] disability, [the plaintiff] must 'present some affirmative evidence that disability was a determining factor in the employer's decision.'"[105] "This burden is 'not onerous,' but it is also 'not empty or perfunctory.'"[106] "The plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, []he would be entitled to judgment as a matter of law."[107]

---

[100] *Id.* (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011)).

[101] *C.R. England*, 644 F.3d at 1038 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).

[102] *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804–05).

[103] *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

[104] Mot. Summ. J. 31.

[105] *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th Cir. 2021) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[106] *Morgan*, 108 F.3d at 1323–24 (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)).

[107] *Id.* at 1324 (citing *Ennis*, 53 F.3d at 59).

Mr. Hanson did not respond to Kennecott's argument in his Opposition,[108] thereby waiving any non-obvious objections.[109] In his Complaint, Mr. Hanson alleged that "shortly" after he informed Kennecott of his disability, Kennecott discriminated against him.[110] But "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."[111] "For example," the Tenth Circuit has "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation."[112] "By contrast, . . . a three-month period, standing alone, is insufficient to establish causation."[113]

Here, the timeline does not establish causation. Mr. Hanson informed Mr. Dumas that he suffered from depression and anxiety in March 2019.[114] In October 2019, Mr. Hanson informed Mr. Dumas about his bipolar disorder diagnosis.[115] According to the record, Mr. Hanson last took FMLA leave—which the court assumes without deciding was an accommodation for his disabilities—April 15–16, 2020.[116] Kennecott terminated Mr. Hanson's employment nearly six months later, on October 6, 2020.[117] Under Tenth Circuit precedent, this six-month period

---

[108] Opp'n, ECF No. 26. Instead, the Opposition argues that Kennecott failed to reasonably accommodate Mr. Hanson and then retaliated against him for requesting reasonable accommodations.

[109] *United States v. Brown*, No. 21-6175, 2023 WL 4398497, at *4 (10th Cir. 2023) ("By failing to respond to the government's argument that Defendant's kidnapping conviction supported the district court's use of § 2K2.1(a)(2), Defendant waived any non-obvious objections he may have had to the government's analysis."); *see also Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1099 (10th Cir. 2019); *Eaton v. Pacheco*, 931 F.3d 1009, 1031 (10th Cir. 2019) ("Notably, Eaton doesn't respond to the state's mootness argument in his reply brief. Accordingly, we treat any non-obvious responses he could have made as waived and assume the state's mootness analysis is correct.").

[110] Compl. ¶ 56.

[111] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

[112] *Anderson*, 181 F.3d at 1179 (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194–97 (10th Cir. 1998)).

[113] *Id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)).

[114] Hanson Dep. 95:16–95:19.

[115] *Id.* at 96:8–96:16, 98:23–99:6.

[116] *Id.* at 113:13–113:16.

[117] Termination Letter.

"standing alone, is insufficient to establish causation."[118] As Mr. Hanson did not respond to this argument in his Opposition and there are no obvious objections to the specific points urged by Kennecott,[119] the court concludes that there is no dispute of material fact, the record evidence does not establish causation for the purposes of Mr. Hanson's prima facie case of disparate treatment, and Kennecott is entitled to summary judgment on this claim.

### B.    Kennecott Is Entitled to Summary Judgment on Mr. Hanson's Disability Discrimination Claim for Failure to Accommodate.

"The ADA defines 'discriminate against a qualified individual on the basis of disability' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'"[120] "While the usual *McDonnell Douglas* framework is inapplicable in a failure-to-accommodate case, this circuit has adopted a modified burden-shifting framework to assess such claims."[121] First, the employee must establish a prima facie case.[122] "[T]he burden then shift[s] to the [defendant] 'to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.'"[123] "If the employer presents

---

[118] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016) (citation omitted).

[119] *Reed v. Bennett*, 312 F.3d 1190, 1196 (10th Cir. 2002) ("By failing to file a response within the time specified by the local rule, [the plaintiff] waived the right to file a response or to controvert the facts asserted in the summary judgment motion. But [the plaintiff]'s waiver did not relieve the court of its duty to make the specific determinations required by Fed. R. Civ. P. 56(c). A district court properly grants summary judgment pursuant to Rule 56 only if the motion demonstrates no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.").

[120] *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (quoting 42 U.S.C. § 12112(b)(5)(A)).

[121] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017).

[122] *Id.*

[123] *Aubrey*, 975 F.3d at 1005 (quoting *Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1204 (10th Cir. 2018)).

such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."[124] "A plaintiff need not establish discriminatory intent to show that an action was taken 'on the basis of disability . . . . [b]ecause "any failure to provide reasonable accommodations for a disability is necessarily because of disability."'"[125]

The parties dispute whether Mr. Hanson has established a prima facie case. Kennecott argues that Mr. Hanson "cannot establish a prima facie claim for failure to accommodate because he never requested any reasonable accommodation."[126] Mr. Hanson responds that he "told [Mr.] Dumas that the reasonable accommodation he needed was patience, understanding and leniency."[127] Kennecott contends that "this does not constitute a request for accommodation under the ADA as a matter of law."[128]

      1.  Mr. Hanson Failed to Establish a Prima Facie Case for His Failure-to-Accommodate Claim.

"[T]here are generally four elements [a plaintiff] ha[s] to show to establish a prima facie failure-to-accommodate claim: 1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the [defendant] refused to accommodate her disability."[129] The parties do not dispute that Mr. Hanson was disabled, and the issue of whether Mr. Hanson was "otherwise qualified" overlaps with whether he requested a plausibly reasonable accommodation, as discussed below. Accordingly, the court turns to consider whether

---

[124] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)).
[125] *Herrmann*, 21 F.4th at 674 (quoting *Lincoln*, 900 F.3d at 1204).
[126] Mot. Summ. J. 32.
[127] Opp'n 17.
[128] Mot. Summ. J. 32 (citing district court cases from Tennessee, California, Pennsylvania, and Texas).
[129] *Aubrey*, 975 F.3d at 1005.

Mr. Hanson presented any evidence that he required an accommodation to perform the essential functions of his job, whether Mr. Hanson made a request, and whether that request was a plausibly reasonable accommodation.

### a. The Court Assumes Without Deciding That Mr. Hanson Required an Accommodation to Perform the Essential Functions of His Job.

"[T]he ADA prohibits a 'covered entity' from 'discriminat[ing] against a *qualified individual* on the basis of disability.'"[130] "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[131] "The plaintiff bears the burden of showing []he is able to perform the essential functions of h[is] job."[132]

Mr. Hanson argues "[t]he parties do no[t] dispute that Mr. Hanson was qualified for his position,"[133] but he does not clarify whether he could perform the essential functions of his position with or without reasonable accommodation. Of course, if he could perform the essential functions of his position without accommodation, his failure-to-accommodate claim fails. For purposes of this decision, the court assumes without deciding that Mr. Hanson required reasonable accommodation to perform the essential functions of his position.

### b. There Is Sufficient Evidence from Which a Jury Could Find That Mr. Hanson Made a Request for Assistance with His Disabilities.

"[B]efore an employer's duty to provide reasonable accommodations . . . is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on

---

[130] *Id.* at 1006 (quoting 42 U.S.C. § 12112(a)).
[131] *Id.* (quoting 42 U.S.C. § 12111(8)).
[132] *Mason*, 357 F.3d at 1119 (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)).
[133] Opp'n 17.

notice."[134] "Although the notice or request 'does not have to be in writing, be made by the employee, or formally invoke the magic words "reasonable accommodation,"' it 'nonetheless must make clear that the employee wants assistance for his or her disability.'"[135] "An employer cannot be liable for failing to accommodate a disability if it is unaware of the need for an accommodation."[136]

There is record evidence from which a reasonable jury could conclude that Mr. Hanson approached Mr. Dumas at least twice and informed him about his mental health diagnoses, once in March 2019 and again sometime between September and November 2019.[137] There is evidence that Mr. Hanson also informed Mr. Romrell about his "mental health issues" in February 2020.[138] Further, there is evidence from which a fact finder could determine that Mr. Hanson "ma[d]e clear that [he] want[ed] assistance for his . . . disability": he stated that each time he spoke with his supervisors about his mental health diagnoses, he asked for "patience, understanding, and leniency."[139] There is also record evidence that he requested intermittent FMLA leave.[140] Although he never asked for "anything else specifically,"[141] this is sufficient record evidence from which a jury could find that Mr. Hanson made a request that put Kennecott on notice that he was seeking an accommodation.

---

[134] *C.R. England*, 644 F.3d at 1049 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).
[135] *Id.*
[136] *Aubrey*, 975 F.3d at 1006.
[137] Hanson Dep. 95:16–95:19, 98:23–101:15; Hanson Decl. ¶¶ 10, 16, 32, 33.
[138] Hanson Decl. ¶¶ 24–25.
[139] *Id.* at ¶¶ 11, 17, 20, 27.
[140] Hanson Dep. 108:13–108:20.
[141] *Id.* at 193:19–194:1.

> c. *There Is Insufficient Evidence for a Jury to Find That Mr. Hanson Requested a Reasonable Accommodation.*

Mr. Hanson seemingly does not contest Kennecott's position that his request for "patience, understanding, and leniency" was not a plausibly reasonable accommodation.[142] Instead, Mr. Hanson asserts that Kennecott "never engaged in any interactive process and did not discuss or contemplate what accommodation would encompass patience, understanding and leniency."[143] Kennecott responds that it satisfied its requirement to engage in the process because it "asked [Mr. Hanson] how it could help him whenever he raised his medical conditions,"[144] but also argues that, even if it did fail to engage in the interactive process, Mr. Hanson's claim still fails because he has "never identified any specific accommodation that would address his purported impairments."[145]

"The federal regulations implementing the ADA 'envision an interactive process that requires participation by both parties.'"[146] "While '[t]he exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated[,]' '[t]he interactive process [necessarily] includes good-faith communications between the employer and employee.'"[147] "This is imperative because each side will possess different information, all of which is critical to determining whether there is a reasonable accommodation that might permit the disabled employee to perform the essential functions of

---

[142] Opp'n 18 ("Defendant never engaged in any interactive process and did not discuss or contemplate what accommodation would encompass patience, understanding and leniency.").
[143] Opp'n 18.
[144] Reply 14.
[145] *Id.* at 15.
[146] *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) (quoting *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)).
[147] *Aubrey*, 975 F.3d at 1007 (quoting *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004)) (alterations in original).

her job."[148] The "goal" of the process is "identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations."[149]

In *Barzellone v. City of Tulsa*, the Tenth Circuit found that the plaintiff did not establish a prima facie case for failure to engage in the interactive process.[150] In that case, the plaintiff notified her employer of a disability that "disqualified her from performing her duties."[151] After her employer offered her reassignment, she declined the offer and her employer terminated her employment.[152] She then sued, alleging her employer had failed to participate in the interactive process.[153] However, she "did not show what jobs she was qualified to do with or without accommodation, and did not describe what, if any, accommodation she needed."[154] The court concluded that the lack of any evidence on those elements precluded her claim.[155]

Here, there is undisputed record evidence that, in March 2019 and October 2019, Mr. Hanson initiated a conversation with Kennecott about his disabilities, and Kennecott asked him how it could help him.[156] There also is evidence that in March, October, and November 2019, as well as February 2020, Mr. Hanson asked Kennecott for "patience, understanding, and leniency."[157] Mr. Hanson states that he "elaborate[d] upon what some of that meant, like, . . . as far as why the absences happened, why the mood swings . . . happen or what to expect."[158] There is evidence that Mr. Hanson requested intermittent FMLA leave for his disabilities in November

---

[148] *Id.*
[149] *Id.* at 1009 (citing *Midland Brake*, 180 F.3d at 1171–74).
[150] *Barzellone v. City of Tulsa*, 210 F.3d 389, 2000 WL 339213 (10th Cir. 2000) (unpublished).
[151] *Id.* at *1.
[152] *Id.* at *2.
[153] *Id.* at *4.
[154] *Id.*
[155] *Id.*
[156] Hanson Decl. ¶ 17, 20; Hanson Dep. 95:16–95:22, 96:4–97:1; Dumas Dep. 16:12–16:17.
[157] Hanson Decl. ¶ 11, 16, 20, 27.
[158] Hanson Dep. 193:9–193:18.

and March 2020,[159] and that his supervisor, Mr. Dumas, told Mr. Hanson he would "do what he could to help" Mr. Hanson seek FMLA for his absenteeism.[160] Mr. Hanson received intermittent FMLA leave, backdated to November 2019.[161]

While the parties make no argument regarding Mr. Hanson's intermittent FMLA leave as an accommodation for his disabilities, the court notes that the record evidence only allows for the following conclusions: that Mr. Hanson communicated his limitation of "absences" due to his disabilities, that he made a request for intermittent FMLA leave as an accommodation for that limitation, and that he received that accommodation. Accordingly, any failure-to-accommodate claim that centers on absences would fail.

That leaves Mr. Hanson's described symptom of "mood swings." Mr. Hanson did not share the information he—and only he—possessed about what essential functions of his job were impaired by his mood swings and what accommodation would address those limitations. Like in *Barzellone*, Mr. Hanson provided no evidence of his impaired ability to complete essential functions of his position caused by his mood swings or evidence that he communicated those limitations to Kennecott, nor evidence of a plausibly reasonable accommodation for those limitations or that he communicated that plausibly reasonable accommodation to Kennecott.

The evidence demonstrates that Mr. Hanson was terminated for a kaleidoscope of misconduct, including loafing, leaving his job during work hours without supervisory permission, making false statements, and insubordination.[162] If this behavior was attributable to his disabilities, there is no evidence that Mr. Hanson ever communicated to Kennecott such

---

[159] *Id.* at 101:19–102:1, 109:14–110:12.
[160] *Id.* at 108:13–108:20.
[161] *Id.* at 111:20–112:3.
[162] Termination Letter.

limitations and sought accommodation for them. Therefore, as in *Barzellone*, Kennecott is entitled to summary judgment on Mr. Hanson's failure-to-accommodate claim because Mr. Hanson failed to engage in the interactive process about his limitations other than absences.

As Kennecott observes, there is a second ground for granting Kennecott summary judgment on this claim. "'To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate,' inter alia, 'the employee could have been reasonably accommodated but for the employer's lack of good faith.'"[163] This means that, "[w]hen alleging a failure to accommodate, a plaintiff carries the burden of demonstrating the existence of a facially reasonable accommodation."[164] In other words, "the employer's failure to interact with the employee does not preclude the employee from losing on summary judgment because the employee must still prove a reasonable accommodation could have been made."[165] Mr. Hanson did not demonstrate the existence of a facially reasonable accommodation, and therefore, his failure-to-accommodate claim fails because there is no evidence that Kennecott could have provided him reasonable accommodation.

In the conclusion of his Opposition, for the first time, Mr. Hanson summarily asserts that "[t]here were many options for accommodating [Mr.] Hanson, including placing him on part-

---

[163] *Midland Brake*, 180 F.3d at 1174 (quoting *Taylor*, 174 F.3d at 165); *Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty.*, 363 F. App'x 548, 552 (10th Cir. 2010) ("[A] plaintiff must show 'that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual.'" (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000))).
[164] *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009) (citing *Mason*, 357 F.3d at 1122); *see also Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) ("Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate." (quoting *White*, 45 F.3d at 361)).
[165] *Frazier v. Simmons*, 254 F.3d 1247, 1262 (10th Cir. 2001) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)); *Hennagir*, 587 F.3d at 1265 ("Even if [an employer] fail[s] to fulfill its interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation was possible . . . ." (quoting *Midland Brake*, 180 F.3d at 1174) (alterations in original)); *see Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1231 (10th Cir. 2009).

time, placing him in a different position, allowing him to take 12 weeks of uninterrupted FMLA, [or] meeting with [Mr.] Hanson and his co-workers to explain what was transpiring as to [Mr.] Hanson's mental health."[166] But he offers no support or explanation for this conclusory statement. And as Kennecott points out,[167] Mr. Hanson identifies no record evidence that would support a finding that these were "facially reasonable accommodations." Mr. Hanson does not identify any record evidence that his position could have been part-time or that Kennecott had another position that would accommodate his disabilities. In addition, he does not identify how part-time work or reassignment would have enabled him to perform the essential functions for which he required accommodation,[168] or that there was an available position for his reassignment and that he was qualified for that position.[169] There also is record evidence that Kennecott asked Mr. Hanson if he wanted to take a leave of absence, and Mr. Hanson told them "it was out of the question."[170] Finally, there is no record evidence to suggest that having a meeting with Mr. Hanson and his coworkers would have "presently, or in the near future, enable[d] [Mr. Hanson] to perform the essential functions of his job."[171]

"Although [the court] must resolve doubts in favor of the non-moving party, 'conclusory allegations standing alone will not defeat a properly supported motion for summary judgment.'"[172] Mr. Hanson has failed to meet his burden to identify record evidence from which

---

[166] Opp'n 21.

[167] Reply 16.

[168] *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) ("A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue.").

[169] *Duvall v. Georgia-Pac. Consumer Prod., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010) ("[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation." (citing *Taylor v. Pepsi–Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999))).

[170] Hanson Dep. 195:24–197:1.

[171] *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1193 (10th Cir. 2022) (quoting *Aubrey*, 975 F.3d at 1007).

[172] *Butler v. Wal-Mart Stores, Inc.*, 202 F.3d 281 (10th Cir. 1999) (quoting *White*, 45 F.3d at 363).

a jury could find the existence of a facially reasonable accommodation. This means that even if he had sufficiently engaged in the interactive process for his limitations other than absences—which the court has concluded he did not—his prima facie case would still fail because he did not demonstrate the existence of a plausibly reasonable accommodation. Accordingly, Kennecott is entitled to summary judgment on Mr. Hanson's failure-to-accommodate claim.[173]

## II.   Kennecott Is Entitled to Summary Judgment on Mr. Hanson's Retaliation Claim Because Mr. Hanson Has Failed to Identify Evidence from Which a Reasonable Jury Could Find Pretext.

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."[174] It also makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter."[175] "Where a plaintiff relies on circumstantial evidence to establish his claim, the *McDonnell Douglas* burden-shifting framework applies"[176]:

> [O]nce the plaintiff has established a prima facie case of retaliation, the employer has the burden of coming forth with a legitimate, nondiscriminatory reason for its adverse action. If the employer does so, the plaintiff may then present evidence that the reason given by the employer is a mere pretext for the real, discriminatory reason for the adverse action.[177]

---

[173] Kennecott also argues that Mr. Hanson's failure to accommodate claim "fails because his allegations are time barred." Mot. Summ. J. 33. However, because the court has found for Kennecott on the merits, it need not address or resolve this argument.

[174] 42 U.S.C. § 12203(a).

[175] *Id.* § 12203(b).

[176] *Lincoln*, 900 F.3d at 1209.

[177] *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003) (quoting *Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999)).

The parties dispute both whether Mr. Hanson has established a prima facie case and whether Mr. Hanson has identified evidence of pretext at stage three.

### A.   The Court Assumes Without Deciding That Mr. Hanson Established a Prima Facie Case.

Kennecott urges that, even if Mr. Hanson had requested a reasonable accommodation,[178] he cannot show "any causal connection between his request for 'patience, leniency, and understanding' in March 2019, October 2019, and February 2020, and his termination nearly eight months later in October 2020."[179] Mr. Hanson responds that there is "a close temporal proximity, less than three months, between [Mr. Hanson] requesting reasonable accommodations from [Kennecott] and the termination of his employment."[180]

"To establish a prima facie case of retaliation, a plaintiff must show '(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action.'"[181] "[A]n ADA retaliation plaintiff may rely solely on temporal proximity to show causation during the prima facie stage of the *McDonnell Douglas* framework where his protected activity is closely followed by an adverse employment action."[182] "[M]ere days or even hours" between the protected activity and the adverse action suffices to show causation at the prima facie stage,[183] but, as noted earlier, a one-and-a-half-month period may, by

---

[178] Kennecott also disputes whether Mr. Hanson requested a reasonable accommodation. As discussed above, there is evidence from which a jury could find that Mr. Hanson requested—and was granted—intermittent FMLA leave for his disabilities. Because the parties do not make argument regarding Mr. Hanson's FMLA leave, the court decides this issue on other grounds without further addressing Kennecott's argument on this point.
[179] Mot. Summ. J. 35.
[180] Opp'n 21.
[181] *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1225 (10th Cir. 2016) (quoting *Morgan*, 108 F.3d at 1324).
[182] *Foster*, 830 F.3d at 1191.
[183] *Id.*

itself, establish causation.[184] On the other hand, a three-month period, standing alone, is insufficient.[185]

As noted earlier, there is record evidence that in March, October, and November 2019 and February 2020, Mr. Hanson asked Kennecott for "patience, understanding, and leniency" for his disabilities.[186] According to the record, Mr. Hanson last took intermittent FMLA leave—leave he was granted for his disabilities—April 15–16, 2020.[187] Mr. Hanson does not cite to the record for his contention that "the last time he requested accommodation was in August 2020."[188] However, the court assumes without deciding that there is evidence from which a jury could find that Mr. Hanson engaged in protected activity in August 2020.

If Mr. Hanson did engage in protected activity sometime in August 2020 and was terminated on October 6, 2020, there is a one- to two-month gap between the protected activity and the adverse employment action. There is no record evidence of the precise date of his (assumed) protected activity. And while Tenth Circuit precedent establishes that the lower range of this time period could suffice to establish causation,[189] Mr. Hanson does not identify any case law—binding or otherwise—in which a court has held that evidence of a two-month gap between protected activity and adverse action suffices to establish causation. However, the court need not

---

[184] *Anderson*, 181 F.3d at 1179.
[185] *Richmond*, 120 F.3d at 209.
[186] Hanson Decl. ¶¶ 11, 16, 20, 27.
[187] Hanson Dep. 113:13–113:16.
[188] Opp'n 21. The court is unaware of any evidence that Mr. Hanson made a request for reasonable accommodation in August. However, in his deposition, Mr. Hanson stated that he "made a report on Speak Out" in August 2020, making "several complaints." Hanson Dep. 82:16–82:23. He "complained that [his] FMLA rights had been violated" and that Mr. Dumas and Mr. Romrell "had created a toxic working environment" by "talk[ing] trash . . . on employees that had called in or weren't there." *Id.* at 82:20–83:2. This does not appear to be evidence of a request for reasonable accommodation, Opp'n 21, but, as it could be considered "opposition" to "any act or practice made unlawful" by the ADA, the court does not resolve the claim on this issue. *See* 42 U.S.C. § 12203(a).
[189] *Anderson*, 181 F.3d at 1179.

determine whether two months is sufficient because it finds that, regardless, Mr. Hanson has not

met his burden on the final stage of the *McDonnell Douglas* analysis.

### B.    There Is Evidence That Kennecott Had a Legitimate, Nondiscriminatory Reason for Its Adverse Action.

Once the plaintiff has established a prima facie case of retaliation, the "employer has the

burden of coming forth with a legitimate, nondiscriminatory reason for its adverse action."[190]

Here, Kennecott offers that Mr. Hanson's insubordination and leaving his workstation during

work hours without supervisory permission were the reasons motivating his termination.[191]

These code of conduct violations stemmed from Mr. Hanson's refusal to work with a contract

worker and his subsequent unauthorized departure from the job site[192] on September 24, 2020.[193]

His termination letter also cited his insubordination and false statements for which he had been

suspended on August 14, 2020.[194] The August suspension was for his loafing behavior on

August 5, 2020, as well as the false statements he made to his supervisors during their

investigation.[195] This is sufficient evidence to satisfy Kennecott's burden of production at this

stage.

### C.    Mr. Hanson Has Failed to Demonstrate Pretext.

"The last step in the *McDonnell Douglas* framework shifts the burden of production back

to [the plaintiff] to show that [the defendant]'s stated justification for his termination was

pretextual."[196] "[A] plaintiff demonstrates pretext by showing either that a discriminatory reason

---

[190] *Doebele*, 342 F.3d at 1135 (quoting *Butler*, 172 F.3d at 752).
[191] Termination Letter.
[192] Hanson Dep. 180:24–181:2; Dumas Dep. 25:5–26:1.
[193] Hanson Dep. 179:4–179:7.
[194] Termination Letter.
[195] Dumas Dep. 46:6–46:17.
[196] *Foster*, 830 F.3d at 1194 (citing *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012)).

more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[197] "This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence."[198]

Kennecott argues that Mr. Hanson "has no evidence that his employment was terminated for any reason other than his misconduct, much less that he was terminated because of his alleged disability or for engaging in any protected activity."[199] Mr. Hanson responds with the same argument and evidence as for causation at the prima facie stage: that the temporal proximity of Mr. Hanson's protected activity to his termination is sufficient for a jury to find that Kennecott's justifications were pretextual.[200] But "although [the court] may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext."[201] Accordingly, because Mr. Hanson has failed to meet his burden at the final stage of the *McDonnell Douglas* analysis, summary judgment for Kennecott is appropriate.[202]

---

[197] *Id.* (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)).
[198] *Aubrey*, 975 F.3d at 1015 (citing *Lincoln*, 900 F.3d at 1193).
[199] Mot. Summ. J. 36.
[200] Opp'n 21.
[201] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) (citing *Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juv. Det. Facility*, 101 P.3d 1170, 1178 (Kan. 2004); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); and *Anderson*, 181 F.3d at 1180).
[202] Because the court has determined that Kennecott is entitled to summary judgment on the merits, it need not address Kennecott's argument that Mr. Hanson's claims "should be dismissed [because] he is barred from pursuing any damages due to his admitted wrongdoing." Mot. Summ. J. 18.

**ORDER**

IT IS HEREBY ORDERED that Kennecott's Motion for Summary Judgment is

GRANTED. Furthermore, because all claims in this case are resolved by this Order, the Clerk of

the Court is ordered to enter judgment in favor of the defendant and to close this case.

Signed July 27, 2023.

BY THE COURT

David Barlow
United States District Judge